Filed 9/14/16  Certified for publication as modified 10/6/16 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| KRISTEN NICODEMUS et al., <br><br> Plaintiffs and Appellants, <br> v. <br><br> SAINT FRANCIS MEMORIAL HOSPITAL et al., <br><br> Defendants and Respondents. | A141500 <br><br> (S.F. City & County <br> Super. Ct. No. CGC-13-531076) |

Plaintiff Kristen Nicodemus filed this action against HealthPort Technologies, LLC (HealthPort) and Saint Francis Memorial (Saint Francis) (collectively, defendants), alleging they overcharged her for copies of her patient medical records. She sought to bring the action on her own behalf and on behalf of others who, acting through an attorney, requested patient medical records from a medical provider in California prior to litigation and were charged more than the amounts specified in Evidence Code[1] section 1158. Plaintiff's motion to certify the class was denied. We conclude this was error and reverse.

---

[1] All statutory references are to the Evidence Code.

1

# I.  BACKGROUND

## A.  Statutory Framework

Section 1158 is designed to require medical providers to produce the medical records demanded by patients prior to litigation in a timely fashion and at a reasonable cost.  At the time of plaintiff's appeal, section 1158 provided in pertinent part: "Whenever, prior to the filing of any action or the appearance of a defendant in an action, an attorney at law . . . presents a written authorization therefor signed by an adult patient [or by a patient's guardian, conservator, parent, or personal representative], . . . a licensed hospital . . . shall make all of the patient's records . . . available for inspection and copying by the attorney at law . . . promptly upon presentation of the written authorization."  (Former § 1158.)[2]  The statute authorizes the requesting attorney to employ a professional photocopier to obtain the records on the attorney's behalf, and the provider must produce the records within five days.  (*Ibid.*)  All "reasonable costs" incurred by a medical provider in locating, copying, or making the records available may be charged to the requesting party, subject to limits set forth in the statute, which include $0.10 per page for reproducing documents measuring up to 8.5 by 14 inches, $0.20 per page for producing documents from microfilm, and clerical costs not to exceed $16 per hour per person for locating and making records available.  (*Ibid.*)

---

[2] Although former section 1158 was amended effective January 1, 2016 (Stats. 2015, ch. 528, § 1, p. 4475), the amendments did not alter the substance of the provisions relevant to this appeal.  As amended, section 1158, subdivision (b) now provides, "Before the filing of any action, . . . if an attorney at law . . . presents a written authorization therefor signed by an adult patient [or by a patient's guardian, conservator, parent, or personal representative] . . . to a medical provider, the medical provider shall promptly make all of the patient's records . . . available for inspection and copying by the attorney at law . . . ."  And, subdivision (a) now defines " 'medical provider'" as including "a licensed hospital."  (§ 1158, subd. (a).)  The amendments included no changes to the language of the paragraph defining " 'reasonable cost.' "  (Compare Stats. 2015, ch. 528, § 1; with Stats. 1997, ch. 442, § 15, p. 2871.)

" 'The legislative purpose behind the enactment [of section 1158] is not stated, but its apparent goal is to permit a patient to evaluate the treatment he or she received before determining whether to bring an action against the medical provider. Section 1158 also enables the patient to seek freely advice concerning the adequacy of medical care and to create a medical history file for the patient's information or subsequent use. It operates to prevent a medical provider from maintaining secret notes which can be obtained by the patient only through litigation and potentially protracted discovery proceedings.' " (*Thornburg v. Superior Court* (2006) 138 Cal.App.4th 43, 50, quoting *National Football League Management Council v. Superior Court* (1983) 138 Cal.App.3d 895, 903 (*National Football League*).)

### B.    Plaintiff's Request for Medical Records

According to the complaint, in June 30, 2011, plaintiff was admitted to Saint Francis for treatment of injuries sustained when she was burned by exploding fuel gel from a firepot. Later she engaged an attorney to represent her in a potential lawsuit. Plaintiff's attorney sent a fax to Saint Francis asking that it provide her copies of plaintiff's medical records, and attaching a signed authorization to release the information.

In that period, HealthPort provided Saint Francis with patient medical record release-of-information services pursuant to a contract (the contract).[3] Under the contract, HealthPort agreed, among other things, to review requests for patient medical records that Saint Francis received, gather responsive records, and provide copies to requestors. When attorneys requested client medical records "in a matter in which the medical records are an issue (including a request issued pursuant to CA Evidence Code 1158),"

---

[3] The parties agree that (1) the contract is reflected in multiple agreements between HealthPort, on the one hand, and Saint Francis or Dignity Health, on the other; (2) Dignity Health is the parent company of Saint Francis; and (3) Dignity Health previously was known as Catholic Healthcare West.

3

HealthPort agreed it would provide those same services as "representative of [the attorney] request[er] . . . after receiving written authorization from the attorney." HealthPort assigned personnel on-site at Saint Francis to perform the services.

Operating under the contract, HealthPort responded to plaintiff's attorney's request for plaintiff's medical records, sending a "California Agent Fee Information" sheet (information sheet) and an invoice. In a section explaining the invoice charges, the information sheet quoted section 1158, acknowledging its requirement that medical providers must allow attorneys to inspect and copy patient records on presentation of a patient's written authorization. The information sheet, however, went on to state: "HealthPort has agreed to copy records for you, upon your hiring of HealthPort as your representative/agent for purposes of making such copies. The rates that HealthPort is charging do not fall under [section] 1158." [4]

HealthPort's invoice to plaintiff's counsel sought payment of $86.52, and provided directions for payment. The amount included a $30 "basic fee," a $15 "retrieval fee," $25.25 for copying 101 pages at $0.25 per page, $10.30 for shipping, and $5.97 for sales tax. The invoice included a statement directing requestors to the information sheet for more details, and advising, "Payment implies that you agreed to employ HealthPort as your professional photocopy representative for purposes of this request and that you accepted the charge denoted below on this invoice."

Plaintiff's attorney paid HealthPort's invoice in full, noting on the check's memo line, "under protest · in violation of CA EVID CODE 1158," and plaintiff later reimbursed her attorney for that cost. HealthPort delivered the requested copies.

---

[4] HealthPort would also schedule a time for attorneys to inspect records and, under the contract, had to allow attorneys the option of sending in a different photocopy service if they prefer.

## C.      Plaintiff's Action and Motion for Class Certification

In May 2013, plaintiff filed her complaint against defendants alleging causes of action for violation of section 1158 and violation of the Unfair Competition Law (UCL) (Bus. & Prof. Code, § 17200 et seq.).  (*Thornburg v. El Centro Regional Medical Center* (2006) 143 Cal.App.4th 198, 204–205 [section 1158 is enforceable by private right of action].)

On November 22, 2013, plaintiff moved for an order certifying the following class:  "All adult patients, guardians or conservators of adult patients (or of the adult patient's estate), parents or guardians of minor patients, or personal representatives or heirs of deceased patients, who:  (1) requested medical records from a hospital or other medical provider (as enumerated in [section 1158]) located in California; (2) through an attorney at law or his/her representative; (3) prior to litigation[;] and (4) were charged by HealthPort more than:  (a) ten cents ($0.10) per page for reproduction of medical records [8.5] x 14 inches or less, (b) twenty cents ($0.20) per page for reproduction of medical records from microfilm, (c) $16.00 per hour (computed on the basis of four dollars per quarter hour or fraction thereof) for clerical costs, (d) actual postal charges, and/or (e) actual costs charged by a third person, from May 1, 2009 to present."

In support of her motion for class certification, plaintiff submitted evidence obtained through discovery describing HealthPort's procedure for handling attorney requests seeking client medical records.  According to that material, if the attorney requesting the records does not indicate plans to use a different photocopy service, the receiving medical facility automatically forwards the request to its on-site HealthPort representative.  That person obtains and combines all responsive paper and electronic medical records, transmitting them together in an encrypted format to the corporate office in Georgia.

In Georgia, HealthPort personnel index all requests, assigning them to categories, depending on the context. Requests involving subpoenas or workers' compensation claims, respectively, for example, are grouped in separate categories.

HealthPort tracks all requests using a database. The database includes requester (or "customer") names and contact information, patient names, medical provider names, and fee and invoicing information. It also assigns index numbers for billing purposes based on request categories. For example, all attorney requests—or "attorney personal injury" requests, as HealthPort refers to them—that attach release authorization forms and seek patient records of California medical providers are indexed with the billing code "07."

After requests are entered into its database, HealthPort sends invoices to requesters, releasing records to them once it receives payment, or earlier if the requester has an existing agreement with HealthPort. HealthPort has followed the same process at all of its California locations since May 1, 2009. Between May 1, 2009 and July 31, 2013, it processed 152,546 attorney requests for California medical providers, using the same invoice form, and charging the same per-page copying fee ($0.25).

**D.    Defendants' Evidence Opposing Class Certification**

In opposition to the motion for class certification, HealthPort submitted the declaration of Matthew J. Rohs, its Executive Vice-President and General Manager for Release-Of-Information (Rohs declaration). In his declaration, Rohs advised that, while some of the attorney requests tracked in HealthPort's database specifically referred to section 1158, "[m]any, if not most," did not. For those that did not, he maintained, HealthPort lacks information necessary to determine whether the section applies. For example, section 1158 applies to requests made before "the filing of any action or the appearance of the defendant in an action," but attorney requests usually do not indicate the timing of the records requests in relation to litigation or whether records are sought in connection with litigation at all. The attorney request data set, therefore, Rohs

6

maintained, would include any instances in which patients or their personal representatives had their attorneys request their records for a purpose independent of litigation.

Further, HealthPort contended, relying on the Rohs declaration, although the attorney request data set included patient names, this information alone would not suffice to identify all class members. Some requests sought the records of patients who were minors, deceased, or subject to a conservatorship or guardianship. In such instances, the release authorization form would have been signed by the patient's personal representative, and HealthPort did not enter those names in its database. To obtain those names, therefore, its staff would have to separately search electronically stored copies of the release authorization forms, recording each name as it went, a process that would take "at least 2 to 3 minutes for each transaction."

Saint Francis joined HealthPort in opposing class certification, and also argued separately that the proposed class was overbroad as against Saint Francis. The proposed class, it observed, would include all those who, through an attorney, requested copies of medical records from "a hospital or other medical provider . . . located in California" and were charged by HealthPort more than the amounts specified in section 1158. While HealthPort processed 152,546 attorney requests in California in the relevant period (May 1, 2009 to July 31, 2013), only a small number of those transactions (2,429) involved Saint Francis.[5]

---

[5] The parties appear to agree that HealthPort processed attorney requests for "more than 500" medical facilities or providers in California in the relevant period. The only evidentiary citation offered to support this agreed-upon fact is to a cryptic statement included in plaintiff's counsel's declaration. Plaintiff's counsel averred that a spreadsheet provided by defense counsel, which contained transactions for Saint Francis, identified "500 unique entries under the column heading 'Requester Name.' " The statement seems to describe the number of individuals who requested records from Saint Francis, rather than the number of entities contracting with HealthPort for services. As

7

**E.     The Trial Court's Ruling**

The trial court denied the motion for class certification.  It ruled plaintiff had not demonstrated the proposed class was ascertainable, or that common issues predominated, because she had not presented a mechanism for determining whether attorneys requests were submitted " 'prior to litigation' . . . without individualized inquiry, for example, by asking" each attorney.  The court concluded HealthPort's data set was both over- and under-inclusive.  The data set was over-inclusive, the court reasoned, because it would encompass requests that were not submitted "prior to litigation" and may not have had anything to do with contemplated litigation.  It was under-inclusive because it did not capture the names of class members who authorized records requests as a patient's guardian, conservator, or personal representative.[6]  "This is an ascertainability problem," the court concluded, "as well as a problem of individual issues overwhelming any common issues."

The trial court also observed that the class definition did not rely on or require contact with Saint Francis, leaving unclear the theory under which class members as a whole might recover against that defendant.

This timely appeal ensued.

---

the specific assertion is not critical to our decision in this matter, we need not resolve the ambiguity.

[6] The trial court's order stated, somewhat ambiguously, on this point that the data set did not "capture class members" who requested records as a patient's guardian, conservator, or personal representative.  The Rohs declaration, which the order cited, confirmed, however, that requests submitted by such individuals would be captured, although only patient names would be recorded.

## II.  DISCUSSION

### A.     Standard of Review

"Because trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification.  ([*In re Tobacco II Cases* (2009)] 46 Cal.4th [298,] 311].)  In the absence of other error, a trial court ruling supported by substantial evidence generally will not be disturbed unless (1) improper criteria were used or (2) erroneous legal assumptions were made.  (*Ibid.*)  When a trial court's decision rests on an error of law, that decision is an abuse of discretion.  (*Ibid.*)"  (*Pfizer Inc. v. Superior Court* (2010) 182 Cal.App.4th 622, 629.)  Accordingly, in our review of an order denying class certification, "we consider only the reasons given by the trial court for the denial, and ignore any other grounds that might support denial."  (*Quacchia v. DaimlerChrysler Corp.* (2004) 122 Cal.App.4th 1442, 1447.)  " 'Any valid pertinent reason stated will be sufficient to uphold the order.' [Citation.]"  (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 436 (*Linder*).)

### B.     Standards for Class Certification

"The criteria for class certification are well established.  'Code of Civil Procedure section 382 authorizes class actions "when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court . . . ."  The party seeking certification has the burden to establish the existence of both an ascertainable class and a well-defined community of interest among class members.' "  (*Medrazo v. Honda of North Hollywood* (2008) 166 Cal.App.4th 89, 96 (*Medrazo*), quoting *Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 326 (*Sav-On*).)  " 'The certification question is "essentially a procedural one that does not ask whether an action is legally or factually meritorious." [Citation.]  A trial court ruling on a certification motion determines "whether . . . the issues which may be jointly tried, when compared with those requiring separate

9

adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants." [Citations.]' " (*Medrazo, supra*, 166 Cal.App.4th at p. 96, quoting *Sav-On, supra*, 34 Cal.4th at p. 326.)

" '[T]his state has a public policy which encourages the use of the class action device.' " (*Sav-On, supra*, 34 Cal.4th at p. 340.) " ' "Generally, a class suit is appropriate 'when numerous parties suffer injury of insufficient size to warrant individual action and when denial of class relief would result in unjust advantage to the wrongdoer.' [Citations.]" [Citation.] "[R]elevant considerations include the probability that each class member will come forward ultimately to prove his or her separate claim to a portion of the total recovery and whether the class approach would actually serve to deter and redress alleged wrongdoing." [Citation.] "[B]ecause group action also has the potential to create injustice, trial courts are required to ' "carefully weigh respective benefits and burdens to allow maintenance of the class action only where substantial benefits accrue to both litigants and the courts." ' [Citation.]" ' " (*Lee v. Dynamex, Inc.* (2008) 166 Cal.App.4th 1325, 1333 (*Lee*), quoting *Newell v. State Farm Gen. Ins. Co.* (2004) 118 Cal.App.4th 1094, 1101.)

### C.     Ascertainability

#### 1.     *Legal Principles*

" 'Ascertainability is achieved "by defining the class in terms of objective characteristics and common transactional facts making the ultimate identification of class members possible when that identification becomes necessary." ' (*Bomersheim v. Los Angeles Gay & Lesbian Center* (2010) 184 Cal.App.4th 1471, 1483, quoting *Hicks v. Kaufman & Broad Home Corp.* (2001) 89 Cal.App.4th 908, 915 (*Hicks*).)" (*Aguirre v. Amscan Holdings, Inc.* (2015) 234 Cal.App.4th 1290, 1300 (*Aguirre*).) " 'While often it is said that "[c]lass members are 'ascertainable' where they may be readily identified without unreasonable expense or time by reference to official records" [citations], that statement must be considered in light of the purpose of the ascertainability requirement.'

10

(*Medrazo, supra,* 166 Cal.App.4th at p. 101.) 'Ascertainability is required in order to give notice to putative class members as to whom the judgment in the action will be res judicata.' (*Hicks, supra*, 89 Cal.App.4th at p. 914; see [*Aguiar v. Cintas Corp. No. 2* (2006)] 144 Cal.App.4th [121,] 135 [(*Aguiar*)]; *Medrazo, supra*, 166 Cal.App.4th at p. 101.)" (*Aguirre, supra*, 234 Cal.App.4th at p. 1300.)

"The goal in defining an ascertainable class 'is to use terminology that will convey "sufficient meaning to enable persons hearing it to determine whether they are members of the class plaintiffs wish to represent." [Citation.] ". . . Otherwise, it is not possible to give adequate notice to class members or to determine after the litigation has concluded who is barred from relitigating." ' (*Global Minerals* [*& Metals Corp. v. Superior Court* (2003)] 113 Cal.App.4th [836,] 858].)" (*Aguirre, supra*, 234 Cal.App.4th at pp. 1300–1301.) The representative plaintiff is not obligated, however, to "identify, much less locate, individual class members to establish the existence of an ascertainable class. [Citations.] Nor must the representative plaintiff establish a means for providing personal notice of the action to individual class members. [Citation.]" (*Ibid.*)

"In determining whether a class is ascertainable, the trial court examines the class definition, the size of the class and the means of identifying class members." (*Bufil v. Dollar Financial Group, Inc.* (2008) 162 Cal.App.4th 1193, 1207 (*Bufil*).)

### 2. *Application of principles*

HealthPort conceded the "07" attorney request data set included all attorney requests attaching release authorizations that California medical providers received and forwarded for HealthPort to handle. The court found the data set was over-inclusive as a means of identifying class members because "[s]ome of the requests [the data set captured] may have been made prior to litigation that was filed, some after litigation was filed, and some may have been made *in contemplation of* litigation . . . which actually never was filed." The data set also "will capture requests which . . . may not have

11

anything to do with contemplated litigation," the court concluded. The only evidence offered on this point was provided in the Rohs declaration.

Rohs stated: "Many, if not most attorney requests . . . do not contain any of the information necessary to determine whether or not Section 1158 applies. . . . Requests by attorneys almost never say anything about the timing of the request in relation to actual or contemplated litigation, and usually do not indicate whether the request even relates to litigation. HealthPort personnel are not tasked to determine whether the requests by attorneys fall within the statutory requirements of Section 1158, and they do not have the information needed to do so. HealthPort has no way to look into the '07' data set and determine which, if any, of the transactions there involved requests that met the requirements of Section 1158. The '07' data set also includes requests in which patients, or the personal representatives of [patients], want copies of the patient records for their own purposes, but communicate their request through their attorneys rather than doing so themselves."

This declaration does not provide evidence that the "07" data set includes many, or even any, attorney requests made either after litigation was commenced or unrelated to litigation. HealthPort conceded it had no evidence on this point at oral argument: "[T]he 07 data set is used for requests that come in from attorneys . . . . [T]he criteria for [section] 1158 are . . . not disclosed in the requests that come in from attorneys, typically. Specifically, the temporal connection, whether [the request is] before litigation . . . whether it has any connection to contemplated litigation, all of that's a factor. [¶] That information is simply not provided in the request itself."

The court's finding that the "07" data set was over-inclusive, therefore, appears to be pure speculation. Indeed, the fact that HealthPort characterizes the data set internally as "attorney personal injury" requests suggests it expects attorneys submitting such requests do so for the purpose of pursuing litigation. Consistent with this apparent expectation, HealthPort notifies *all attorneys* whose requests it handles that section 1158

12

cost limitations will not apply if it makes and delivers the requested copies. Based on HealthPort's speculative assertions, the trial court concluded that the data set may include requests not covered by section 1158. This mere possibility does not demonstrate that the data set is over-inclusive.

But even assuming the attorney request data set does include some unknown number of requests that were submitted after litigation was commenced (or after defendants' first appearance) or for reasons unrelated to litigation, this fact would not defeat ascertainability. HealthPort argued, and the trial court concluded, that a class is not ascertainable if the class members who are entitled to recover from the defendants cannot be identified without an individualized inquiry. That is not, however, the standard for determining whether a class is *ascertainable*. As noted, a class is properly defined in terms of "objective characteristics and common transactional facts making the ultimate identification of class members possible when that identification becomes necessary." (*Hicks, supra*, 89 Cal.App.4th at p. 915.) Plaintiff here has identified the class in terms of objective characteristics, tracking the provisions of section 1158; if it is determined later in the litigation that the "07" data set includes requests not made pursuant to section 1158, "those [persons] can be eliminated from the class at that time." (*Aguiar, supra*, 144 Cal.App.4th at p. 136; see also, *Sav–On, supra*, 34 Cal.4th at p. 333 [" 'a class action is not inappropriate simply because each member of the class may at some point be required to make an individual showing as to his or her eligibility for recovery . . .' "]; *Bell v. Farmers Ins. Exchange* (2004) 115 Cal.App.4th 715, 743 [class of all employees in certain job categories ascertainable even though some employees may not have worked overtime and thus may not be entitled to any recovery].) Nor should a court "decline to certify a class simply because it is afraid that insurmountable problems may later appear at the remedy stage." (*Reyes v. San Diego County Bd. of Supervisors* (1987) 196 Cal.App.3d 1263, 1275.)

HealthPort acknowledges case law establishing that "certification is not defeated by a subset of non-claimants in a class ascertainable from the defendant's records." But it maintains that the class in this case is not ascertainable at all because HealthPort's records do not establish the timing or purpose of attorney requests. We disagree. The attorney request data set sufficiently matches the class definition, with the exceptions noted by HealthPort. At this stage of the litigation, for the reasons discussed above, it is reasonable to infer that most of the requests included in the data set were submitted "prior to litigation."[7] (See *Aguiar, supra*, 144 Cal.App.4th at p. 136; *Rosack v. Volvo of America Corp.* (1982) 131 Cal.App.3d 741, 753–754.) HealthPort has presented no reliable evidence to the contrary.

The cases that HealthPort cites on this point are distinguishable. *Hale v. Sharp Healthcare* (2014) 232 Cal.App.4th 50, for example, affirmed an order decertifying a class after nearly three years of litigation on the issue. There, the defendant was required to develop a protocol to identify from its records the class of persons who "self-pa[id]"— and were allegedly overcharged—for their emergency room treatment. Based upon the results of that protocol, notice was sent to more than 120,000 patients as potential class members. (*Id.* at p. 53.) After receiving responses, and taking discovery from some of the putative class members, the defendant presented evidence that the protocol was not successful in identifying the "self-pay" class members, nor in determining whether they were overcharged. Defendant explained that there was no reliable way of ascertaining the class without individual inquiry because a record marked "self-pay" was not updated

---

[7] HealthPort acknowledges that requests are "prior to litigation" even if no related litigation is later commenced. At least one appellate court also has suggested that an attorney request intended to "create a medical history file for the patient's information or subsequent use" would be within the scope of section 1158, contrary to HealthPort's arguments in speculating about other purposes possibly motivating attorney requests. (See *National Football League, supra*, 138 Cal.App.3d at p. 903.)

14

if the patient's bill was actually paid by a third party. (*Id.* at p. 55.) Additionally, the defendant presented evidence that common issues did not predominate because the determination of whether rates charged to "self-pay" patients were higher than those charged to insured patients would require the analysis of over 7,000 line items for the procedures, services and goods provided to each patient, and then a comparison to the myriad of reimbursement rates which, in turn, varied broadly because they were " 'patient-specific, contract-specific, and plan-specific.' " (*Id.* at p. 65.) Accomplishing the task would require the construction of additional databases and tens of thousands of hours to review the patient notes sections of each patients file, and then make the calculations. (*Id.* at pp. 65–66.) Therefore, the core question in *Hale*—whether defendant charged "self-pay" patients more than it charged to insured patients—could not be determined without an individualized assessment of each patient's records. Consequently, the court affirmed the trial court's decertification of the class. (*Id.* at pp. 66–67.)[8]

Apart from the distinctive procedural posture of *Hale*—a motion for class decertification *after* notice and discovery—it is distinguishable on its facts. There, it was indisputably demonstrated that there was simply no way to avoid a complicated individualized inquiry to determine not just eligibility for damages but to prove liability. (*Id.* at pp. 54, 63–64.) Conversely, we find the *Bufil* case instructive. There, employees of a check cashing chain brought meal and rest break claims. (*Bufil, supra,*

---

[8] *Miller v. Bank of America, N.A.* (2013) 213 Cal.App.4th 1, which HealthPort cited at oral argument, is also inapposite. There, this court affirmed an order denying class certification because the definition of the proposed class exceeded the scope authorized under the relevant statute, and plaintiff could not show—and did not even attempt to show—that there was any means to identify a class of persons whose transactions were within the statutory proscription. (*Id.* at pp. 7–9.)

15

162 Cal.App.4th at pp. 1196–1197.) The proposed class was defined as employees for whom the defendant's records depicted a meal period not taken because the employee was the only person in the store or was the only person present except for a trainee. (*Id.* at pp. 1201, 1203.) Although employees who missed a meal period could be identified from the defendant's records, employees who missed a rest period could not be identified from the records. (*Id.* at pp. 1207–1208.)

Reversing the trial court's denial of class certification on this basis, the Court of Appeal concluded the class was ascertainable from the defendant's records. (*Bufil, supra,* 162 Cal.App.4th at p. 1207.) In doing so, the court rejected the defendant's "speculation" that an employee who missed a meal break nonetheless might have received a rest break, observing "speculation that goes to the merits of ultimate recovery [was] an inappropriate focus for the ascertainability inquiry." (*Id.* at p. 1208; accord, e.g., *Lee, supra,* 166 Cal.App.4th at p. 1336 [defendants records were adequate to identify those who qualified for class membership; "appropriate exclusions can be implemented at a later stage"]; *Harper v. 24 Hour Fitness, Inc.* (2008) 167 Cal.App.4th 966, 976 (*Harper*) ["the need to individually examine each member's contract to ultimately determine whether he or she qualifies for inclusion in the class does not . . . demonstrate a lack of ascertainability or manageability"].)

We reach the same conclusion here. The potential class members may readily be identified by reference to HealthPort's attorney request data set. HealthPort's speculation that some included requesters may have sought records after filing a lawsuit or without any thought of doing so—speculation that goes to the merits of each class member's recovery—was an inappropriate focus for the ascertainability inquiry.

The trial court also erred in finding that HealthPort's attorney request data set did not provide an adequate mechanism for identifying class members because it was under-inclusive. The court stated that the data set did not capture class members who authorized requests as a patient's guardian, conservator, or personal representative,

16

apparently relying on the fact that it did not capture their *names*.[9]  It is undisputed, however, that the data set does include all such requests, and contains other relevant information such as patient names, and the names and contact information for the attorney requesters.  The primary purpose of ascertainability is to provide notice to all potential class members.  (*Hicks, supra*, 89 Cal.App.4th at p. 914.)  HealthPort's "07" data set contains sufficient information for identifying this subset of class members and, therefore, does not defeat ascertainability.

"It is firmly established a plaintiff is not required at this stage of the proceedings to establish the . . . identity of class members." (*Reyes, supra*, 196 Cal.App.3d at p. 1274.)  " 'A class is ascertainable if it identifies a group of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to identify himself or herself as having a right to recover based on the description.' [Citations.]" (*Aguirre, supra*, 234 Cal.App.4th at pp. 1299–1300.)  Even if "class members are unidentifiable" at the class certification stage, this would "not preclude a complete determination of the issues affecting the class." (*Daar v. Yellow Cab Co.* (1967) 67 Cal.2d 695, 706.)

The trial court itself rejected HealthPort's argument that it would be difficult to provide notice to those class members for whom it lacked names, concluding "there may be other means to contact them, such as various forms of publication."  In doing so, it cited plaintiff's reply brief supporting the motion for class certification, which suggested alternatives including combining direct mail to patients' attorneys (whose contact information HealthPort has) with publication of notice (an alternative defense counsel had supported in representing HealthPort's predecessor in another action).  HealthPort does not suggest this method would be ineffective.

---

[9] See fn. 6, above, at p. 8.

17

We, accordingly, conclude that the court erred as a matter of law in finding the proposed class was not ascertainable.

### D.     Community of Interests

#### 1.     *Legal Principles*

To obtain class certification, the party advocating class treatment also must demonstrate a "well-defined community of interest among the class members." (*Linder, supra*, 23 Cal.4th at p. 435.)  This requirement " ' "embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class." ' [Citations.]" (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1021 (*Brinker*).)

"The 'ultimate question' the element of predominance presents is whether 'the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.' [Citations.]  The answer hinges on 'whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment.' [Citation.]" (*Brinker, supra*, 53 Cal.4th at p. 1021.)  A theory of liability that a defendant has "a uniform policy . . . [that] allegedly violates the law . . . is by its nature a common question eminently suited for class treatment." (*Id.* at p. 1033.)

#### 2.     *Application of Principles*

The trial court denied class certification on the additional ground that common questions did not predominate; it concluded "difficulties in identifying which [attorney] requests were made 'prior to litigation' present[ed] individual issues" that "would overwhelm the common issues."  Again, we must disagree.  The predominance of common questions requirement is patently satisfied here.  Plaintiff presented evidence at the class certification hearing, and HealthPort conceded that, as a "release-of-

18

information" service provider to Saint Francis and others, it has a uniform practice of informing requesting attorneys it will copy records but will charge them $0.25 per page for copying (and other fees). The common class question is whether this practice violates section 1158—which places limits on the copying and other fees that may be charged— insofar as the practice applied to attorney requests "prior to litigation." In other words, the common goal of the entire class is to adjudicate whether HealthPort is improperly charging attorneys requesting copies of patient medical records before litigation more than the amounts specified in section 1158.

It is well established that " '[p]redominance is a comparative concept, and "the necessity for class members to individually establish eligibility and damages does not mean individual fact questions predominate." ' " (*Medrazo, supra*, 166 Cal.App.4th at pp. 99–100, quoting *Sav-On, supra*, 34 Cal.4th at p. 334; accord *Collins v. Rocha* (1972) 7 Cal.3d 232, 238 ["that each class member might be required ultimately to justify an individual claim does not necessarily preclude the maintenance of a class action"]; and see *Reyes, supra*, 196 Cal.App.3d at p. 1278 ["it is firmly established that 'a class action is not inappropriate simply because each member of the class may at some point be required to make an individual showing as to his or her eligibility for recovery' "].)

"The relevant comparison lies between the costs and benefits of adjudicating plaintiffs' claims in a class action and the costs and benefits of proceeding by numerous separate actions—*not* between the complexity of a class suit that must accommodate some individualized inquiries and the absence of any remedial proceeding whatsoever." (*Sav-On, supra,* 34 Cal.4th at p. 339, fn. 10.) As the California Supreme Court has recognized, class actions eliminate " ' "the possibility of repetitious litigation and provide[] small claimants with a method of obtaining redress for claims which would otherwise be too small to warrant individual litigation." ' " (*Id.* at p. 340, quoting *Richmond v. Dart Industries, Inc.* (1981) 29 Cal.3d 462, 469.) "[T]he possibility that a defendant may be able to defeat the showing of an element of a cause of action ' "as to a

19

few individual class members[,] does not transform the common question into a multitude of individual ones." ' [Citation.]" (*Weinstat v. Dentsply Internat., Inc.* (2010) 180 Cal.App.4th 1213, 1235.)

The common question here is the application of section 1158 to HealthPort's uniform practices in response to attorney requests for medical records. The fact that each class member ultimately may be required to establish his or her records request was submitted before or in contemplation of litigation does not overwhelm the common question regarding those uniform copying practices. The trial court erred in ruling otherwise.[10]

### E. Saint Francis

As a final reason for its decision to deny class certification, the trial court questioned the propriety of including Saint Francis in the action, observing that the proposed class also would extend to those who requested records of other California medical providers. Deeming the class definition "ambiguous with respect to the role of [Saint] Francis," the court expressed uncertainty about the theory upon which "the class as a whole if certified would be entitled to recover against [Saint] Francis." In the class

---

[10] We do not reach HealthPort's related but distinct argument that the trial court's ruling should be affirmed because plaintiff did not present a plan for managing individual showings as to eligibility for recovery (i.e., a procedure for proving class members requested records "prior to litigation"). (See, e.g., *Duran v. U.S. Bank Nat. Assn.* (2014) 59 Cal.4th 1, 28–29 (*Duran*).) As HealthPort itself acknowledges, the trial court did not cite this consideration in its ruling, and "we are constrained by the reasons set forth by the court for denying certification." (*Bufil, supra,* 162 Cal.App.4th at p. 1206.) Nor do we anticipate manageability would be a significant issue in this case. Determining whether individual class members requested records before litigation would not appear to require an involved procedure or a complex analysis. (See *Sav-On, supra,* 34 Cal.4th at p. 339 ["For decades, '[t]his court has urged trial courts to be procedurally innovative' [citation] in managing class actions"]; compare *Duran, supra,* 59 Cal.4th at p. 28 ["class treatment is not appropriate 'if every member of the alleged class would be required to litigate *numerous and substantial questions* determining his individual right to recover following the "class judgment" on common issues' "], italics added.)

20

certification hearing, the court remarked, "I don't know why we have Saint Francis in the case at all. Maybe Saint Francis isn't necessary." "[H]ow are we going to manage [damages]," it continued. "Saint Francis is not surely going to be jointly and severally liable with respect to the whole class?"

The trial court thus appeared to conclude that plaintiff's joinder of Saint Francis created an ascertainability problem distinct from the one discussed above, i.e., that class members would have to present a separate claim against Saint Francis. We do not agree that the inclusion of Saint Francis as a defendant presented an ascertainability problem.

A court may deny certification on ascertainability grounds, finding a class definition overbroad, if there is substantial evidence that a significant part of the putative class is ineligible to recover against any defendant under any theory alleged in the complaint. (*Thompson v. Automobile Club of Southern California* (2013) 217 Cal.App.4th 719, 729–730.) Such a finding, however, is not supported by the mere fact that each class member cannot pursue his or her claims against all defendants. *Vasquez v. Superior Court* (1971) 4 Cal.3d 800, 805, is a case in point. The California Supreme Court concluded the complaint in that action alleged an ascertainable class, even though each class member had claims both against a single seller and also against one of three finance companies to whom the seller had assigned the class member's contract. (*Id.* at pp. 805, 810–811, 815; see, e.g., *B.W.I. Custom Kitchen v. Owens-Illinois, Inc.* (1987) 191 Cal.App.3d 1341, 1345–1346 (*B.W.I. Custom Kitchen*) [reversing denial of class certification in action by California businesses that indirectly purchased glass containers from any one of numerous corporate defendants].) Similarly, in this case, the class definition includes all those whose attorney requests HealthPort processed under contract with a California medical provider. Each class member arguably will have a claim against HealthPort and also the individual medical provider that held its records. The class definition is not limited to Saint Francis patients.

21

The court did not question the viability of plaintiff's claims against Saint Francis. Although plaintiff did not also join other California medical providers who contracted with HealthPort, there has been no suggestion she was obligated to do so. " ' "It has long been the rule that it is not necessary for all joint tortfeasors to be named as defendants in a single lawsuit." ' [Citations.]" (*Van Zant v. Apple Inc.* (2014) 229 Cal.App.4th 965, 979.)[11]

The court also appears to have been concerned about the possibility that Saint Francis might be held responsible, at the damages stage, for HealthPort's alleged overcharging for providing copies of records held by other California medical providers. We agree with plaintiff, however, that this is not a reason to deny class certification. "It has been repeatedly held . . . that the presence of individual damage issues cannot bar certification." (*B.W.I. Custom Kitchen, supra*, 191 Cal.App.3d 1341, 1354 [to deny class certification " 'on the issue of damages . . . may well be effectively to sound the death-knell of the class action device' "].)

" '[I]n most circumstances a court can devise remedial procedures which channel the individual [damage] determinations that need to be made through existing forums.' [Citation.] A bifurcated trial, subclasses, and other methods may be employed to simplify the proceedings." (*B.W.I. Custom Kitchens, supra*, 191 Cal.App.3d at p. 1354.) At the class certification stage, however, it is not necessary to determine the appropriate method for resolving such questions, as they may wait "until the class-wide issues have been determined." (*Ibid.*; accord *In re Cipro Cases I and II* (2004) 121 Cal.App.4th 402, 417 [antitrust class action against original and generic manufacturers of antibiotic drug].)

---

[11] As one may not recover twice for the same injury (see, e.g., *Renda v. Nevarez* (2014) 223 Cal.App.4th 1231, 1237 & fn. 4), plaintiff's theory appears to be that HealthPort and each medical provider are jointly liable for each instance of alleged overcharging.

## III.  DISPOSITION

The order denying class certification is reversed and the matter is remanded with directions to grant the motion for class certification.  Plaintiff shall recover costs incurred on appeal.

_____
Rivera, J.

We concur:

_____
Ruvolo, P.J.

_____
Reardon, J.

23

Filed 10/6/2016

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| KRISTEN NICODEMUS et al.,<br><br>        Plaintiffs and Appellants,<br><br>v.<br><br>SAINT FRANCIS MEMORIAL HOSPITAL et al.,<br><br>        Defendants and Respondents. | A141500<br><br>(S.F. City & County<br>Super. Ct. No. CGC-13-531076)<br><br>**ORDER GRANTING REQUEST FOR PUBLICATION, MODIFYING OPINION, AND DENYING PETITION FOR REHEARING** |

**THE COURT:[12]**

Good cause appearing, Plaintiff and Appellant Kristen Nicodemus' request to publish this Court's September 14, 2016 opinion is granted as modified by the following:

On page 2, first paragraph under section I(A)—

- Replace the first sentence with the following (outside quotes not to be included):  "Section 1158 is designed to require medical providers to produce the medical records demanded by patients through their attorneys prior to litigation in a timely fashion and at a reasonable cost."

On page 12, second full paragraph, sentence beginning with "HealthPort conceded"—

- Replace the words "it had no evidence on this point at oral argument:" with "at oral argument that the data set did not track the timing of requests:"

---

[12] Ruvolo, P.J., Reardon, J., and Rivera, J., participated in this decision.

1

On page 13, first full paragraph, second sentence beginning with "As noted,"—

- Remove text reading "a class is properly defined in terms of 'objective characteristics and common transactional facts making the ultimate identification of class members possible when that identification becomes necessary.' (*Hicks, supra*, 89 Cal.App.4th at p. 915.)" and,
- Replace the stricken portion with the following quotation and citation: "[a]scertainability is required in order to give notice to putative class members as to whom the judgment in the action will be res judicata. [Citations.] . . . As long as the potential class members may be identified without unreasonable expense or time and given notice of the litigation, and the proposed class definition offers an objective means of identifying those persons who will be bound by the results of the litigation, the ascertainability requirement is met." (*Medrazo, supra*, 166 Cal.App.4th at p. 101.)

On page 16, first full paragraph, citation following the second sentence reading "(*Id.* at p. 1208; accord, e.g.,"—

- Remove the following language: "*Lee, supra,* 166 Cal.App.4th at p. 1336 [defendants records were adequate to identify those who qualified for class membership; "appropriate exclusions can be implemented at a later stage"];" and
- Replace stricken portion with the following (outside quotes not to be included): "*Medrazo, supra*, 166 Cal.App.4th at p. 101 [defendant's sales records offered an objective means of identifying potential class members, and plaintiff's inability at the class certification stage to identify precisely which buyers qualified as class members was "irrelevant"];"

On page 17, first full paragraph, after the citation reading "(*Aguirre, supra*, 234 Cal.App.4th at pp. 1299–1300.)"—

- Insert a footnote with the following language (outside quotes not to be included): "We reject defendants' argument that potential class members would not be able to self-identify because they would not themselves have personal knowledge whether their attorneys requested their medical records *before* litigation. We think it likely many clients would recall the juncture at which they signed the medical release form; additionally, we expect they could ascertain the timing of the request by consulting their attorneys or any litigation records they retained. It is also possible that notice might be mailed directly to attorneys who presumably would be able to determine this point for their clients."

2

Defendants and Respondents Saint Francis Memorial Hospital et al.'s petition for rehearing, filed on September 29, 2016, is denied for lack of good cause.

There is no change in judgment.


Dated: _____          _____, P.J.

3

_Nicodemus et al. v. Saint Francis Memorial Hospital et al._ (A141500)

| | |
|---|---|
| Trial Court: | City & County of San Francisco |
| Trial Judge: | Hon. Curtis E.A. Karnow |
| | |
| Counsel for Plaintiffs & Appellants: | Andrus Anderson LLP, Lori E. Andrus; Hersh & Hersh, P.C., Mark E. Burton |
| Counsel for Defendants & Respondents: | Woollacott PLC, Jay Woollacott; |

4